IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| VANESSA DIXON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-00013-RAH |
| | ) | |
| NATIONAL SECURITY OF | ) | |
| ALABAMA, INC., d/b/a DTA | ) | |
| SECURITY SERVICES | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This action arises out of alleged race discrimination and retaliation that Vanessa E. Dixon (Plaintiff or Dixon) suffered at the hands of her employer, National Security of Alabama, Inc. d/b/a DTA Security Services (Defendant or DTA).

According to Dixon, as set forth in this matter's operative pleading (Amended Complaint) (Doc. 8), DTA did nothing to stop her immediate supervisor's racial harassment. Instead, the powers that be eventually reassigned and then discharged her due to her complaints. In somewhat confusing fashion, Dixon advances the same essential claim against DTA under several related, but distinct, federal statutes in a single count (Count One): 42 U.S.C. §§ 2000e *et seq.* (Title VII); 42 U.S.C. § 1981;

1

and 42 U.S.C. § 1983.  She follows Count One with a separate general count (Count Two) for "Damages."

DTA has moved for summary judgment as to both of Dixon's claims on the basis of Dixon's inability to establish a prima facie case of discrimination or retaliation.  In this regard, DTA attacks Dixon for having failed to demonstrate sufficiently either any adverse employment action or temporal proximity between any improper act and her separation.  It further challenges the cogency of her claims under Sections 1981 and 1983.

For the reasons discussed below, the Court finds that summary judgment is due to be granted.

## I. STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure (Rule individually, and Rules collectively), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Rule 56 [ ] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original).  The moving party bears the initial burden of proving the absence of a genuine issue of

material fact.  *Id*. at 323.  If the movant meets this threshold, the nonmoving party must "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted).

On summary judgment, a court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994).  Any factual disputes will thus be resolved in the non-movant's favor, but when—but only when—sufficient competent evidence supports the non-moving party's version of the disputed facts.  *Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith*

---

[1] Consistent with this standard, this opinion presents Plaintiff's credible allegations as facts solely for purposes of this matter's adjudication.

*Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, that party must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. If the non-movant's response relies on nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See, e.g.*, *Holifield v. Reno*, 115 F.3d 1555, 1565, n.6 (11th Cir. 1997); *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995).

## II. RELEVANT FACTUAL BACKGROUND

DTA is a provider of neighborhood security services in Montgomery, Alabama. (*See* Doc. 8 at 2; *see also* Doc. 15 at 1.)

Dixon has been employed with DTA on two occasions as a certified security officer. (Doc. 47-2 at 5, 13-14.) On the first occasion, Dixon left her employment due to injuries she suffered as a result of an unrelated slip and fall accident at a local hospital. (*Id.* at 5.) No discrimination-related issues plagued her first stint with DTA. (*Id.* at 14.)

The current litigation arises out of Dixon's second spell. During this time, which lasted from May 2014 to June 2015, Dixon was assigned to a post located near Huntingdon College in Montgomery, Alabama. (*Id.* at 6, 8.) The parties dispute Dixon's exact date of separation and whether she actually separated from DTA.

4

According to Dixon, her employment with DTA changed with the appointment of Lena Williams (Williams) as Captain and therefore Dixon's supervisor in January 2015.  (Doc. 47-2 at 14, 16, 32; *see also* Doc. 50-1.)  Until that point, her working days had been uneventful and satisfactory. (Doc. 47-2 at 14, 16, 32; *see also* Doc. 50-1.)  Unfortunately, this working relationship apparently soured and turned adversarial at the outset. (Doc. 47-2 at 27; *see also* Doc. 50-1.)

Dixon traces this animosity to one thing: Williams did not want African-Americans assigned to the Huntingdon College post.  (*See* Doc. 47-2 at 21-22, 32.) Allegedly, as told to her by a "white" DTA co-employee, Williams hoped to make the post "all white again."  (*Id.* at 21-22, 32.)  On another occasion, a client (a local resident) told Dixon that she should watch out for herself because Williams had told her that she did not like African-Americans.  (*Id.* at 22.)  Later, Williams began calling and giving Dixon directives and verbal counseling almost immediately.  (*Id.* at 20.)   At one point, Williams warned Dixon to do precisely what Williams instructed her to do in handling paperwork or she was going to "hang" and then "drag" Dixon down to the main office.  (Docs. 50-1; *see also* Doc. 47-2 at 21.)  Once, Williams threw Dixon's paperwork across a car and ordered Dixon to pick it all up in front of several DTA clients.  (Doc. 47-2 at 22; *see also* Doc. 50-1.)

Dixon alleges more.  Allegedly, Williams would follow her and watch her while she performed her duties.  (Doc. 50-1; *see also* Doc. 47-2 at 22.)  Dixon also

had to complete tasks that were not required of other white employees assigned to Williams' post, such as gassing up the patrol car and picking up newspapers, boxes and the mail.  (Doc. 47-2 at 23.)

For her part, Williams denies that she ever made such statements or took such actions against Dixon.  (Doc. 52-1 at 1-2.)

Dixon was not alone in her issues with Williams.  Indeed, a co-employee, Tina Tait (Tait), believed she was harassed as well.   In her complaints to DTA's management, Tait identified Dixon as a witness to harassment and discrimination by Williams. (Doc. 47-2 at 26, 40; *see also, e.g.*, Doc. 50 at 2; Doc. 50-1.)

Dixon met with DTA management about Williams, during which she confirmed that Williams also was harassing her.  (Doc. 50-1.)  Dixon subsequently complained to Major Harry Christian (Christian) and Captain McGhee at DTA about Williams' conduct.  (Doc. 47-2 at 14, 18, 24, 29, 35; *see also* Doc. 50-1.)  Among others, Dixon recounted Williams' alleged "hang" and "drag" threats.  (Doc. 50-1; *see also* Doc. 47-2 at 18, 33.)

As alleged by Dixon, DTA management opted to ignore all these complaints. (Doc. 47-2 at 18, 26.) The unsurprising resulted: Williams' behavior toward Dixon to worsened.  (*Id.*; *see also* Doc. 50-1.)

On April 13, 2015, Dixon filed a charge of discrimination (Charge) with the Equal Employment Opportunity Commission (EEOC).  (Doc. 50-1.)  In the Charge,

Dixon stated that she had been discriminated against on the basis of her race, beginning as early as January 15, 2015, the date that Williams became her supervisor.  (Doc. 47-2 at 13; *see also* Doc. 50-1.)  She also claimed that she had experienced retaliation in terms of intensified harassment by her supervisor, i.e. Williams, after she met with DTA management about the harassment complaint lodged by Tait.  (Doc. 47-2 at 19-20; *see also* Doc. 50-1.)

Despite Dixon's filing of her EEOC charge, Williams' harassment intensified. For example, Dixon overhead a conversation between another employee and Williams in which Williams inquired about whether Dixon had been moved and whether the employee could work at the Huntingdon post in Dixon's place.  (Doc. 47-2 at 19.)  Not long thereafter, in late May or early June 2015, Dixon was moved from the Huntingdon post and re-assigned to a warehouse location in Montgomery. According to Dixon, she was reassigned from the post in retaliation for her complaints about Williams' harassment and discrimination.  (*Id.* at 25.)

DTA, according to a June 8, 2015 memorandum, gives a different explanation for what transpired.  Per its version, on June 2, 2015, Christian told Dixon that two guards were returning to DTA from the Huntington post because of a cut-back in hours.  (Doc. 47-6; *see also* Doc. 47-7.)   For this reason, and no other, Dixon was reassigned to a new, higher-paying post at Southeastern Stud.  (Docs. 47-6; *see also* Doc. 47-7.)

Although this new assignment netted better pay, Dixon proved unable to manually open and close a gate due to a longstanding back condition. (Doc. 47-2 at 17, 27-29.)  Dixon contends DTA moved her to this new post knowing she could not work it.  (*Id.* at 28-29.)  According to DTA, however, no such foreknowledge existed, and it first learned of Dixon's issue when Dixon herself reported back that the gate was too heavy for her to close.  (Doc. 50-4.)

This dilemma prompted a conversation with Christian.  Christian told Dixon that the previous security guard assigned to the post, who was also female, had no problem with the gate, but that he would assign her to another post.  (*Id.*)  Dixon responded by pointing out that she also could not work that post at night because of her medications.  (*Id.*)

Following this discussion, Dixon made repeated calls back to DTA for a new post assignment.   (Doc. 47-2 at 16.)  A DTA representative, Ray Rawlings (Rawlings), however, kept hanging up the phone when Dixon inquired about her next place of assignment.  (*Id.* at 16-17.)

Ultimately, Dixon never worked a post for DTA again, receiving no additional assignments.  (*See id.* at 16-18.)  She today fixes her date of termination as May 28, 2015, when Christian asked her to leave the property once Dixon showed up for work at Huntingdon College.  (*Id.* at 13, 15, 17.)

8

For its part, DTA offers several counters.  It first claims that Dixon quit her job.  (Doc. 52-1 at 4.)  It next asserts that it offered Dixon a position and post reassignment that paid her more money, but that Dixon gave a myriad of excuses as to why should could not work the post.  (Doc. 52 at 4-5; *see also* Doc. 52-1 at 1-2.)

Soon thereafter, Dixon applied for unemployment compensation with the Alabama Department of Labor.  (Doc. 47-2 at 17.)  According to Dixon, she identified her reason for separation as "lack of work", not termination based on discrimination.  (*Id.* at 18.)

In the aftermath of her separation, Dixon did not file a new EEOC charge regarding her perceived termination, nor did she amend her April 2015 charge to include her termination. (*Id.* at 38-39.)  Dixon subsequently received her right to sue letter from the EEOC.  (Doc. 1-1 at 8; *see also* Doc. 47-2 at 20.)

On January 8, 2018, Dixon launched this matter with her first pleading.  (Doc. 1.)  She filed an Amended Complaint on February 28, 2018.  (Doc. 8.)

## III. ANALYSIS

As to her every claim, Dixon cannot satisfy the minimum set by Rule 56.  As noted above, to withstand summary judgment, the nonmoving party must be able to point to the existence of enough admissible evidence to show that "a reasonable jury could return a verdict for the[m]."  *Dixon v. Hallmark Cos.*, 627 F.3d 849, 854 (11th

Cir. 2010).  As shown below, however, she has provided not much more than an insufficient scintilla of evidence and relied on insupportable interpretations of law.

### A. Title VII - Race Discrimination

In DTA's view, Dixon has failed to provide the quantum and quality of evidence required to sustain her claim for race discrimination under Title VII and § 1981 past summary judgment under Rule 56.   Based on binding jurisprudence, the Court agrees.

To begin, "Title VII and § 1981 claims 'have the same requirements of proof and use the same analytical framework.'" *Chapter 7 Tr. v. Gate Gourmet, Inc*., 683 F.3d 1249, 1256-57 (11th Cir. 2012) (quoting *Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1330 (11th Cir. 1998)).  Each claim's elements, in fact, are identical. *Hilliary v. FlightSafety Int'l, Inc.*, 778 F. App'x 835, 839 (11th Cir. 2019).  So bound, courts tend to concurrently consider such claims, both either falling or surviving together.  *See Allen v. S. Communs. Servs.*, 963 F. Supp. 2d 1242, 1250, 1250-53 (N.D. Ala. 2013) (so doing).  For purposes of DTA's summary judgment motion, the Court therefore makes no distinction as to Dixon's claims arising under either Title VII or § 1981.

Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e2(a)(1). Establishing a prima facie case

of discrimination based on disparate treatment, under Title VII, as Dixon has sought to do, requires "showing that the employer acted with discriminatory intent." *Hill v. Metro. Atl. Rapid Transit Auth.*, 841 F.2d 1533, 1538 (11th Cir. 1988).

A plaintiff can demonstrate discriminatory intent through either direct or circumstantial evidence. *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999); *see also Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984). Direct evidence can take "the form of actions or remarks of the employer reflecting a discriminatory attitude"; in its absence, a plaintiff must rely on the combination of factors, as set forth in the Supreme Court's *McDonnell Douglas Corp.* decision. *Hill*, 841 F.2d at 1539 (citing 411 U.S. 792 (1973)).[2] Unfortunately for the Court, the parties make virtually no argument as to whether they have presented direct evidence and/or circumstantial evidence of discrimination in this case. The Court will proceed, out of an abundance of caution, to examine both analytical frameworks.

### 1. Direct Evidence of Discrimination

Dixon has pointed to several statements by her supervisor, Williams, as evidence of discrimination. On at least one occasion, Williams told Dixon that if

---

[2] A plaintiff can also show discriminatory intent through statistical evidence. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). Because Dixon has offered no such evidence or argument, the Court will pretermit further discussion of this method of analysis.

Dixon did not do what Williams instructed her to do in handling paperwork, Williams was going to "hang and drag" Dixon down to the office. (Doc. 47-2 at 21; *see also* Doc. 50-1.)  Dixon also asserts that Williams said she did not want African-Americans assigned to the Huntingdon post because, as another DTA employee told Dixon, Williams wanted to make the post "all white again."  (Doc. 47-2 at 21-22, 32.)  Dixon further claims that Williams told a client that Williams did not like African-Americans. (*Id.* at 22.)

The Eleventh Circuit defines direct evidence of discrimination as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1358 (11th Cir. 1999)(quoting *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641 (11th Cir. 1998)). Direct evidence is "evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Bd. of Trs. of Ga. Military Coll.,* 125 F.3d 1390, 1393 (11th Cir. 1997)(citations omitted). "'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the [basis of a protected classification]' are direct evidence of discrimination." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) (citing *Damon*, 196 F.3d at 1359). If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *See Burrell,* 125 F.3d at 1393.

Due to the "powerful" nature of direct evidence, the Eleventh Circuit "has marked severe limits for the kind of language [that may] be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998). Statements which can be considered direct evidence must either be so broadly discriminatory as to show a general animus towards the protected group in question, or specifically relate to the challenged employment decision. *Burrell*, 125 F.3d at 1394, n.7. To be deemed as such, "a statement must: (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

Using this rubric, the Eleventh Circuit has found that blatant animus is shown in race discrimination cases by a supervisor or hiring authority's use of racial slurs on several occasions. *See*, *e.g.*, *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 922-923 (11th Cir. 1990) (concluding statements that "if it was his company, he wouldn't hire any black people" and "you people [i.e., African Americans] can't do a ———— thing right," constituted direct evidence of discrimination); *Wilson v. City of Aliceville*, 779 F.2d 631, 633 (11th Cir. 1986) (mayor's statement that he "wasn't gonna let no Federal government make him hire no g--d-- n--," in reference to hiring a black law enforcement officer, was direct evidence of discrimination); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 876 (11th Cir. 1985) (supervisor said "(h)alf of them

13

weren't worth a s—" in reference to black employees, constituted direct evidence of discrimination).

In *Damon*, the Eleventh Circuit also noted that a clear example of direct evidence of an employer's intent to discriminate on the basis of an employee's protected characteristic (there, age) which specifically related to the employee's termination "would be a management memorandum saying, 'Fire Earley—he is too old.'"  196 F.3d at 1359 (quoting *Earley v. Champion Int'l Corp*., 907 F.2d 1077, 1081 (11th Cir. 1990); *see also Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 n.13 (11th Cir. 1988) (giving as an example of direct evidence of age discrimination, a scrap of paper reading, "Fire Rollins-she is too old"); *cf. Woods v. Austal, U.S.A., LLC*, Case No. 09-0699-WS-N, 2011 WL 1380054, at *11 n.29, 2011 U.S. Dist. LEXIS 42361 (S.D. Ala. Apr. 11, 2011) (plaintiff's discovery of a noose on factory premises was not direct evidence of racial discrimination).

Turning first to the statements that Williams allegedly made to others (the "white again" statement and the discussion with a client), no evidence is presented that these statements were made by a decisionmaker. While Williams seemingly served as Dixon's supervisor, Dixon has not presented evidence that Williams was "closely involved" in the assignment or termination decisions at DTA, or in the decision to transfer Dixon away from the Huntingdon College post.  The evidence before the Court is that the decision to transfer Dixon was made by another

individual, Rawlings, and no allegation is made that Rawlings has said anything discriminatory concerning Dixon.  Therefore, Williams does not meet the standard for a decisionmaker for purposes of the direct evidence analysis. *Miles,* 750 F.2d at 875.

Further, although Williams' purported comment to a co-employee about making the Huntington College post "white again" and the statement to a DTA client that she did not like African Americans could be evidence of a blatantly discriminatory attitude and a reference to Dixon's eventual transfer to a different post, those two statements clearly constitute inadmissible hearsay and cannot be considered by the Court.   Therefore, the Court cannot consider them. *See Zaben v. Air Prods. & Chems.,* 129 F.3d 1453, 1455–57 (11th Cir. 1997) (comments by low-level supervisors repeating management's discriminatory comments are inadmissible hearsay); *Rojas v. Fla.*, 285 F.3d 1339, 1342 n.3 (11th Cir. 2002); *Damon,* 196 F.3d at 1359 n.1 (11th Cir. 1999).

As to the "hang and drag" statement, although Williams made that statement to Dixon during the months preceding Dixon's transfer and separation, the statement is not so blatant and discriminatory to evince a discriminatory animus towards Dixon's race, nor does it specifically relate to the adverse employment actions that Dixon challenges in this case (her reassignment to the Southeastern Stud post and subsequent separation). While the phrase "hang" to many individuals can be inferred

15

as a reference to race, in the context of Williams' overall statement of "hang and drag" to the office, an equally plausible consideration is that the phrase is not necessarily race-based. "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Gloetzner v. Lynch*, 225 F. Supp. 3d 1329, 1349 (N.D. Fla. 2016) (citing *B/E Aerospace, Inc*., 376 F.3d at 1086). "Evidence…that is subject to more than one interpretation does not constitute direct evidence." *Taylor v. Runyon*, 175 F.3d 861, 867 (11th Cir. 1999)(citing *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir. 1997)). The "hang" statement would require a factfinder to infer or presume that Williams recommended Dixon's transfer and termination to the corporate office (assuming she had the power to do so) because of Dixon's race, as opposed to her job performance or other issues. Thus, when Williams' "hang" statement is considered alongside the circumstances at the time, it does not meet the standard of direct evidence that Williams recommended Dixon's transfer or termination because of her race.

In sum, Dixon has failed to present sufficient direct evidence of discrimination to support her discrimination claim.

## 2.    Circumstantial Evidence of Discrimination

Circumstantial evidence of race discrimination must be analyzed under the burden-shifting framework of *McDonnell Douglas*.    Under this schematic, "the plaintiff must first create an inference of discrimination through [her] prima facie

case." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005) (citing *McDonnell Douglas*, 411 U.S. at 802). "A plaintiff establishes a prima facie case of disparate treatment by showing that she was a  qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *B/E Aero., Inc.*, 376 F.3d at 1087 (citations omitted). In order to establish a prima facie case of discrimination with circumstantial evidence, the plaintiff must show: (1) she is a member of a protected category; (2) she was subjected to an adverse employment action; (3) either she was replaced by a person outside her protected class or a similarly situated employee outside her category was treated more favorably, and; (4) she was qualified to perform her job. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).

Here, the first and fourth factors have been clearly met. First, Dixon is a member of a protected category. Second, she was qualified to perform her job, at least until she was transferred to a post that required a higher than normal amount of physical competence.

However, in order to meet her initial burden, Dixon must also demonstrate two more elements: that she (1) suffered an adverse employment action and (2) was replaced by someone outside her protected class or that a similarly situated employee was treated more favorably.

17

For its part, DTA challenges Dixon's ability to establish that she ever suffered an adverse employment action, but curiously, does not address whether Dixon was replaced by a white employee or treated worse than white employees other than through a general denial of Dixon's claims. (Doc. 46 at 6-7.)

### a. Adverse Employment Actions – Reassignment and Termination

"Courts have uniformly read [Title VII] to require a plaintiff suing under § 2000e-2(a) to establish, as part of his prima facie case, that [s]he suffered so-called 'adverse employment action.'" *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1238 (11th Cir. 2001)(citing *Merriweather v. Ala. Dep't of Pub. Safety*, 17 F.Supp.2d 1260, 1274 (M.D. Ala. 1998)).

The Amended Complaint alleges three adverse employment actions: (1) she was removed from her Huntington post, (2) she was assigned to a post that she could not physically perform, and (3) DTA failed to assign her to any other posts despite her requests, effectively terminating her employment.  DTA does not dispute that Dixon was removed from her Huntingdon post, as it expressly concedes that two employees were moved from the post due to a cut-back in hours, and Dixon herself makes no argument as to why or why not this rises to the level of an actionable employment action.  Instead, focusing solely on Dixon's separation, DTA argues that Dixon has failed to establish that she ever suffered an adverse employment

18

action because Dixon quit her job.  Nonetheless, the Court will consider all three actions.

By law, only an employer's action that "impact[s] the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way" counts as adverse and thus is actionable for purposes of Title VII.  *Davis*, 245 F.3d at 1239 (internal quotation marks omitted).  Proof of "direct economic consequences" is not required, but a plaintiff must show "a serious and material change in the terms, conditions, or privileges of employment" and that the employment action is materially adverse when viewed by a reasonable person in the circumstances.  *Id.* at 1238-39.  After all, "Title VII is neither a general civility code nor a statute making actionable the 'ordinary tribulations of the workplace."  *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), overruled on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d (2006).  The action "must in some substantial way alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee."  *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir. 2008).  Further, the adverse action's impact "must have at least a tangible adverse effect on the plaintiff's employment.  *Davis*, 245 F.3d at 1239.  Therefore, "to prove adverse employment action" a plaintiff "must show a *serious*

19

*and material* change in the terms, conditions, or privileges of employment." *Id.* (emphasis in original).

To begin, Dixon suffered no financial consequence when she was reassigned away from the Huntington post to the Southeastern Stud post. In fact, the record shows that the new post actually paid more money. Without more, based on this fact alone, the Court finds that the decision to transfer Dixon to another post cannot in and of itself constitute a serious and material change in the terms of her employment. *See Kidd v. Mando M. Corp*., 731 F.3d 1196, 1203–04 (11th Cir. 2013) (work reassignment resulting in "a loss of supervisory responsibility," but not a loss of pay or benefits, generally does not constitute an adverse employment action).

Luckily for her, the inquiry does not end there, however, because Dixon further claims that she was intentionally reassigned to a post that she could not physically perform. While "it is important not to make a federal case out of a transfer that is de minimis, causing no objective harm and reflecting a mere chip-on-the-shoulder complaint," *Hawkins v. BBVA Compass Bancshares, Inc*., 613 F. App'x 831, 836 (11th Cir. 2015) (citing *Doe v. Dekalb Cnty. Sch. Dist*., 145 F.3d 1441, 1453 & n.21(11th Cir. 1998)), Dixon has actually offered some evidence that DTA was aware of her physical limitations and that she notified DTA that she was physically unable to perform the new assignment at Southeastern Stud. Where an employee is reassigned to a job that is more physically strenuous than the

employee's previous role, that reassignment can constitute an adverse employment action. *See Sharpe v. Glob. Sec. Int'l*, 766 F. Supp. 2d 1272, 1293 (S.D. Ala. 2011)(court found an employee's reassignment involving "a substantial increase in physical demands" met standard for adverse employment action); *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1078 (11th Cir. 1996). When viewed in the light most favorable towards her, Dixon has thus shown objective harm caused by the reassignment. As such, the Court concludes there is a question of fact as to whether the reassignment from the Huntingdon post amounts to an adverse employment action.

The second adverse employment action alleged by Dixon is her termination from DTA. Undoubtedly, a termination is an adverse employment action. *See, e.g., Crawford*, 529 F.3d at 970 (adverse employment actions include "ultimate employment decisions ... such as termination, failure to hire, or demotion"). While the parties dispute whether Dixon actually was terminated or rather abandoned the job, the evidence nevertheless is disputed on this point; this very row suggests sufficient evidence exists for both sides' construction. Therefore, Dixon has met her burden of showing an adverse employment action through her reassignment and termination.

### b.    Not Adverse Employment Actions

Dixon also alleges that she was treated her less favorably than her white coworkers as to her work assignments.  In Dixon's telling, Williams made her gas up the car, pick up newspapers, boxes, and the mail, all of which were tasks that should have been completed before her shift.  White co-workers, she adds, were not required to do these things.

Based on well-settled precedent, none of Dixon's claims regarding these work assignments rise to the level of an actionable adverse employment action.  "It is clear ... not all conduct by an employer negatively affecting an employee constitutes adverse employment action."  *Davis,* 245 F.3d at 1238.  Rather, the Eleventh Circuit described an adverse employment action as follows:

> [T]o prove adverse employment action in a case under Title VII's antidiscrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Id.* at 1239.  "Criticisms ... and temporary and non-substantial changes in work assignments are not actions that have a 'serious and material effect' on the terms and conditions of employment."  *White v. Hall,* 389 F. App'x 956, 960 (11th Cir. 2010) (citing *Davis*, 245 F.3d at 1241-44); *see also Belt v. Ala. Historical Comm'n,* 181 F. App'x 763 (11th Cir. 2006) (holding minor changes in job duties, including

suspending authority to order inventory and requiring reports to go through supervisor were not adverse employment actions).

Even if unpleasant, the tasks given to Dixon clearly were within her job duties as a neighborhood security guard, a conclusion that Dixon does not really dispute. The Eleventh Circuit has stated that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions." *Davis,* 245 F.3d at 1244. Hence, courts are reluctant "to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm." *Id.* "A change in work assignments" will only be actionable "in unusual instances" where it is "so substantial and material that it does indeed alter the terms, conditions, or privileges of employment." *Id.* at 1245. Considering the fact that the tasks assigned fell within Dixon's preexisting job description, this is not one of those "unusual instances." Accordingly, because the Court concludes the alleged differences in work assignments between Dixon and her white co-workers are neither serious nor material, the differences are insufficient to rise to the level of an actionable adverse employment action.[3]

---

[3] While Dixon alludes to a failure to promote claim, she has offered no evidence other than mere conjecture that she was passed over for the position ultimately given to Williams because of race discrimination. Without proof that Dixon formally applied for the position, if she offered a "justifiable belief" that the employer's discriminatory hiring practices made application a futile gesture, her claim could still proceed. *EEOC v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1274 (11th Cir. 2002). However, Dixon presented no evidence that DTA engaged in systematic

### c. Comparators and Replacement

Title VII requires a plaintiff to demonstrate that her race "was a motivating factor for any employment practice, even though other factors also motivated the practice." § 2000e-2(m).  As discussed above, in order to establish the third element of a prima facie case, Dixon must show either that she was replaced by a person outside her protected class or was treated less favorably than a similarly situated individual outside her protected class.  *Herron-Williams v. Ala. St. Univ.*, Case No. 19-10875, 2020 WL 599301, at *5, 2020 U.S. App. LEXIS 3796 (11th Cir. Feb. 7, 2020) (citing *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing in turn *McDonnell Douglas Corp.*, 411 U.S. at 802).

Under the *McDonnell Douglas* framework, a plaintiff can satisfy her burden by pointing to similarly situated employees outside her protected class, so-called "comparators," who did not suffer the same adverse employment action.  *See B/E Aero.*, 376 F.3d at 1091. As the Eleventh Circuit recently clarified, to be a valid comparator, an employee must be similarly situated "in all material respects" but

---

discrimination that had successfully deterred job applicants from members of minority groups. *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229 (11th Cir. 2011). Indeed, she has not even asserted that submitting an application would have been futile, but only alludes to her belief that she was more qualified than Williams. To the extent that Dixon even asserted a failure to promote claim, she has not met her evidentiary burden to proceed with the claim at the summary judgment stage.

need not be "nearly identical" to the plaintiff. *Lewis v. Union City, GA*, 918 F.3d 1213, 1218-19 (11th Cir. 2019) (en banc).

Dixon attempts to establish the third prong of her prima facie case by comparing herself to her white co-workers, "Mr. Morgan" and Patricia Yarbrough. Dixon also, albeit unclearly, alleges that her Huntingdon College post eventually was filled by Ms. Yarbrough, though her Opposition Brief to Defendant's Motion for Summary Judgment indicates that Yarbrough already was working at that post. (Doc. 50 at 2, 9.)   Dixon has not met her prima facie burden.

First, Dixon asserts that she was treated more harshly than her white colleagues, including having to endure harassment by her white supervisor and having to perform additional tasks.   Other than these vague allegations, Dixon provides little detail.   However, to be a valid comparator, an employee outside the plaintiff's protected class—that is, one who is treated more favorably—must be otherwise similarly situated to the plaintiff in all material respects. *See Lewis*, 918 F.3d at 1218. Though Morgan and Yarbrough may have shared the same supervisor (Williams) as Dixon, Dixon has not otherwise explained how Morgan and Yarbrough "engaged in the same basic conduct," were "subject to the same employment policy, guideline, or rule," or shared Dixon's "employment or disciplinary history." *Lewis,* 918 F.3d at 1227–28 (citations omitted). Without more and without adequate argument, Dixon cannot raise a genuine issue of material fact

that these two employees "cannot reasonably be distinguished" from her.  *Lewis*, 918 F.3d at 1228; *see Wood v. Berryhill*, Case No. 4:18-cv-558-RDP, 2019 WL 3413785, at \*6 n.3, 2019 U.S. Dist. LEXIS 125701 (N.D. Ala. 2019) ("Because Plaintiff's briefs do not present adequate argument on this issue, the court is under no obligation to consider it.").

As the Eleventh Circuit has noted, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  *B/E Aero. Inc.,* 376 F.3d at 1092 (citing *Holifield,* 115 F.3d at 1562).  The burden is on the plaintiff to present affirmative evidence establishing similarity of comparators. *See Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir. 1989) (the burden is on the plaintiff "to show a similarity between [his] conduct and that of white employees who were treated differently and not on [the defendant] to disprove their similarity."); *Keel v. U.S. Dep't of Air Force*, 256 F. Supp. 2d 1269, 1285 (M.D. Ala. 2003) (same).  But, fatally, Dixon has not done so.

In the absence of comparator evidence, Dixon could have resorted to another means of proof: that, following her discharge, she was replaced by someone outside her protected class. *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015).  "[T]he discharged employee's replacement is an effective gauge of intent because a company's hiring practices may reveal its underlying motivation.

26

Therefore, a hiring procedure that reveals evidence of preference for a nonminority is indicative of discriminatory intent." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir. 1989) (footnotes omitted); *see also O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311-13 (1996) (recognizing that proof of replacement by someone "substantially younger" than the plaintiff may lend an inference at the prima facie stage that he was subjected to discrimination because of age in violation of the Age Discrimination in Employment Act).

At earlier points of this litigation, Dixon hinted at this possibility. In particular, she suggested during her deposition that a white employee (Yarbrough) replaced her at the Huntingdon College post. The transcript bears this out:

Dixon: They eventually gave my position -- Ms. Yarbrough, I know she worked that post because Davis- I don't think she wanted to work it anymore. So they gave it to Davis -- Ms. Yarbrough.

…

Defense Counsel: And you don't have any evidence that Patricia Yarbrough got -- was working -- on which post were you saying she was working, by the way?

Dixon: She was working a Huntingdon College post, the same post I was working for DTA.

Defense Counsel: Okay. And do you have any evidence that she got that position because they didn't want you to work it?

Dixon: I can't just say that she—I was told that (Williams) wanted to make Huntingdon College white. She did not want African-Americans there. That's what I was informed.

27

(Doc. 47-2 at 25.)

While Dixon's statements are vague and contradictory, surprisingly, nowhere in DTA's briefs or evidentiary filings did it dispute that Yarbrough replaced Dixon at the Huntingdon post. Instead, DTA has defended its decision by blaming cutbacks to hours as the reason for the elimination of two positions, including Dixon's. (Doc. 47-7.)

Yet, despite her testimonial intimations and DTA's relatively meagre response, Dixon has quite clearly contradicted the former, a deadly oversight, in her own brief opposing summary judgment. (*See* Doc. 50 at 2, 9.) The brief, citing Dixon's deposition (Doc. 47-2 at 22-23), states that Dixon allegedly was being forced to complete other jobs for white employees, including Morgan and Yarbrough; those jobs included assignments at the Huntingdon post. If so, Yarbrough could not possibly have replaced Dixon, as she has argued. In point of fact, yet other contradictory statements elsewhere in the record undermine her contention. For example, at another point in her deposition, Dixon faulted another person, Michelle Davis, for taking over her post though Dixon, by her own reckoning, had seniority over Davis. (*Id.* at 21.) This pivot presents a problem, for the simple fact that Davis is African American and thus part of the same protected class as Dixon. (Doc. 1-1 at 12.)

Regardless, not even such tea leaves can obscure Dixon's essential failing as to this claim: she did not actually advance the argument that she was replaced by a white employee in her complaint or in her briefs, but only hinted at that possibility in her deposition.  This is no light failing, for it is a plaintiff's burden to make a clear presentation of her testimony and claims to demonstrate a prima facie case of discrimination.[4]  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("[T]he Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'"); *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ.,* 342 F.3d 1281, 1289 (11th Cir. 2002) (plaintiff couldn't establish prima facie case where he brought forward no evidence "absent his deposition" regarding how persons outside his protected class were treated more favorably); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record…a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  By relying on, at best, hints culled from her deposition, Dixon has thus failed to carry her prima facie burden here.

### d.    Pretext

---

[4] On appeal, for one, "a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."  *Access Now, Inc. v. Sw. Airlines, Co*., 385 F.3d 1324, 1330 (11th Cir. 2004)*; see also Johnson v. Andalusia Police Dep't*, 633 F. Supp. 2d 1289, 1299 (M.D. Ala. 2009) (claim not mentioned in party's brief waived).

Assuming that Dixon could meet or even had made out the requisite prima facie case, DTA would then bear the burden to articulate a non-discriminatory basis for its employment action. *Vessels*, 408 F.3d at 767 (citing *Tex. Dep't Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Where the employer "articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production." *Id.* at 770. "If the employer meets this burden, the inference of discrimination drops out of the case entirely, and the plaintiff has the opportunity to show by a preponderance of the evidence that the proffered reasons were pretextual." *Id.* at 768 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 511).

Strangely, DTA does not unambiguously provide any legitimate, non-discriminatory reasoning in its briefs. True, it has submitted evidence that it reassigned Dixon from the Huntingdon post due to cutbacks in hours and assigned her to a new post that paid a higher hourly rate. (Docs. 47-6, 47-7, 52-1 at 3-4.) DTA states that it offered to reassign Dixon once again when Dixon complained about being unable to move the gate at her new assignment at Southeastern Stud, but that Dixon then revealed her inability to work the post at night. (Doc. 52-1 at 4.) However, from there, DTA makes no further argument and presents no evidence as to what exactly happened with Dixon and whether any other positions were offered to Dixon. Apart from oblique references to the aforementioned evidentiary materials, (*see* Docs. 46 at 2, 52 at 5, 11), and DTA's repeated unhelpful references

to the same part of its employee handbook notwithstanding, the Court has difficulty finding that DTA has articulated a "clear and reasonably specific non-discriminatory basis" for DTA's actions. *Vessels*, 408 F. 3d at 770.

In this regard, DTA's refuge is the verity that the employer's burden at this stage of the *McDonnel Douglas* analysis is "exceedingly light." *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 257). Under this generous metric, DTA's cutbacks reason is just enough, if only barely. *E.g.*, *Puckett v. McPhillips Shinbaum, LLP*, Case No. 2:06cv1148-ID (WO), 2008 WL 906569, 2008 U.S. Dist. LEXIS 26215 (M.D. Ala. Mar. 31, 2008); *EEOC v. Rollins Acceptance Corp.*, Case No. 1:87-cv-929-WCO, 1988 U.S. Dist. LEXIS 16231 (N.D. Ga. July 19, 1988).

So, if the Court assumes that Dixon's reassignment was due to cutbacks, the burden shifts to Dixon to establish that DTA's reason is merely pretext for discrimination. *See Alexander v. Fulton Cty., Ga.,* 207 F.3d 1303, 1336 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc). To rebut DTA's proffered reasoning, Dixon must present more

31

than mere allegations. *See Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir. 1996). She must prove by a preponderance of the evidence that, more likely than not, discrimination was the real reason for DTA's decision. *See Cason Enters. v. Metro. Dade Cty.,* 20 F. Supp. 2d 1331, 1338 (S.D. Fla. 1998). Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination..." *Id.* at 1339 (citing *Mayfield,* 101 F.3d at 1371).

A plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." *Ritchie v. Indus. Steel, Inc.,* 426 F. App'x 867, 872 (11th Cir. 2011) (*citing Combs,* 106 F.3d at 1538). Rather than "simply quarreling with the wisdom of [the employer's] reason," the plaintiff "must meet that reason head on and rebut it." *Id.* (quoting *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000)). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs." *Alvarez v. Royal Atlantic Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010).

In this regard, Dixon has not sufficiently rebutted DTA's evidence that her reassignment was not due to cutbacks. Again, the lack of clarity in Dixon's pleadings and briefs regarding her ultimate replacement at the Huntingdon post—or

whether there even was one —falls far short of meeting DTA's evidentiary submissions "head on." *Chapman*, 229 F.3d at 1030. Even if a kernel exists somewhere in her papers, the Court is under no obligation to distill every potential argument that could be made based upon the materials before it on summary judgment. *See Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

As to Dixon's ultimate separation, DTA has met its meager burden by categorically denying Dixon's termination, and rather, blaming her for voluntarily leaving the company. According to DTA, there was never a true lack of work for Dixon, and she was told that they "would assign her" to another post that she could perform. Because job abandonment, when evidenced as here, is a legitimate basis for termination, *see Anderson v. JPMorgan Chase & Co.,* 418 F. App'x 881, 884 (11th Cir. 2011); *Perez v. Brands Mart Serv. Corp.,* Case No. 10-61203-CIV-O'Sullivan, 2011 WL 3236022, at *11, 2011 U.S. Dist. LEXIS 82708 (S.D. Fla. July 28, 2011), the burden thus shifts to show that she did not abandon her job.

In response, Dixon now disputes that she voluntarily separated, claiming that Mr. Rawlings hung up the phone after she attempted to contact him about a new post assignment, stating that "we don't have nothing for you." (Doc. 47-2 at 21.) Of course, DTA denies that ever occurred. (Docs. 47-6; 47-7.)

The Court notes there is Eleventh Circuit authority for the proposition that "language ... showing some racial animus may be significant evidence of pretext." *Damon*, 196 F.3d at 1362 (citing *Jones*, 151 F.3d 1321, 1323 n. 11 (11th Cir.1998)). "Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case." *Jones*, 151 F.3d at 1323, n. 11 (citing *Smith v. Horner*, 839 F.2d 1530, 1536–37 (11th Cir. 1988); *E.E.O.C. v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 149 (7th Cir. 1996); *Woody v. St. Clair Comm'n*, 885 F.2d 1557, 1560 (11th Cir. 1989)). The Eleventh Circuit found in *Ross v. Rhodes Furniture* that even an isolated general racial remark can constitute circumstantial evidence of discrimination, and therefore could persuade a jury to disbelieve the defendant's proffered reason. 146 F.3d 1286, 1291 (11th Cir. 1998).

Problematically for Dixon, the statements allegedly made by Williams that might theoretically show a discriminatory environment and that she has offered are either inadmissible hearsay or not sufficiently clear to display racial animus without need for additional inference, and further, are contradicted by DTA. Such evidence alone is insufficient to show pretext.  *See Mason v. Mitchell's Contracting Serv., LLC*, 816 F. Supp. 2d 1178, 1201 (S.D. Ala. 2011) (plaintiff's evidence consisting of personal testimony that was contradicted on the record by other employees and unsworn interview notes from an unavailable witness who had not been cross-

examined were insufficient to show enough racial animus and thereby demonstrate pretext).

Stated differently, Dixon has not identified a "contradiction" in her employer's proffered legitimate reasons for its actions which a "reasonable fact finder could find unworthy of credence." *See Ritchie,* 426 F. App'x. at 872. "If a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326-27 (11th Cir. 2011) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–48 (2000)). Certainly, "[i]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *B/E Aero.*, 376 F.3d at 1091 (citing *Reeves*, 530 U.S. at 147). "A plaintiff may be able to establish that the employer's asserted justification is false and a pretext for discrimination based on some of the same evidence that established a prima facie case of discrimination." *Id.* "A plaintiff need not 'always introduce additional, independent evidence of discrimination.'" *Id.* (citing *Reeves*, 530 U.S. at 148). At the same time, however, allowing the plaintiff to survive summary judgment would be inappropriate if the record "conclusively revealed some other, nondiscriminatory reason" or the "plaintiff created only a weak issue of fact as to

whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Flowers*, 803 F.3d at 1339 (citing *Reeves*, 530 U.S. at 148)*; see Kragor v. Takeda Pharm. Am., Inc.,* 702 F.3d 1304, 1307 (11th Cir. 2012) ("[A] contradiction of the employer's proffered reason for the termination of an employee is sometimes enough, when combined with other evidence, to allow a jury to find that the firing was the result of unlawful discrimination.").

Dixon has failed to present anything other than a "weak issue of fact" regarding whether DTA's stated reasons for her reassignment and separation were untrue. *Reeves*, at 148. To reiterate, the plaintiff in a Title VII lawsuit at all times bears the ultimate burden of persuasion. *St. Mary's Honor Ctr.*, 509 U.S. at 511. Dixon's failure to establish a prima facie case of discrimination and, even assuming she had done so, her failure to show by a preponderance of the evidence that DTA's reassignment was a pretext for discrimination, prove fatal to her Title VII discrimination claim.

### e. Convincing Mosaic

Given the lack of detail by the parties in their pleadings and briefs, the Court has difficulty, to say the least, in discerning whether similarly situated white DTA employees received more favorable treatment or whether Dixon was replaced by a white person. Yet, establishing the elements of the *McDonnell Douglas* framework

"is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lockheed-Martin Corp.* 644 F.3d at 1328. Rather, the plaintiff will survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *Id.* A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id*. Out of an abundance of caution, the Court will examine whether Dixon provided that convincing mosaic here, even though the parties did not even address that method of analysis in the first place.

To sum up the evidence and argument made by Dixon, 1) she was forced to perform more tasks than white employees, 2) she provided hearsay evidence about certain racially charged statements made by her supervisor, 3) she offered her own testimony about her supervisor's harassing language, and 4) she claimed Tait, a fellow African-American employee, was terminated based on race.

The Court examined the first three of those allegations in its *McDonnell Douglas* analysis and will not repeat itself here. *See supra*.

As to Dixon's fourth allegation, Dixon does not explain why Tait signed a document explicitly stating "I Tina La Shawn Tait resign from (DTA) as my employer…of my own free will and have not been forced to resign my position in

37

any way." (Doc. 52-1 at 7.)  Dixon vaguely alludes to the idea that Tait's agreement to signing the separation document was coerced.  (Doc. 47-2 at 20.)  But without any proof of that coercion apart from Dixon's own conjecture, this allusion fails to create an inference that DTA racially discriminated against Dixon.

Evidence of racial discrimination which is "considerably weaker" than that presented in *Lockheed-Martin Corp.* "is insufficient to create a reasonable inference of racial discrimination." *Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1364–65 (11th Cir. 2014) (citing *Lockheed-Martin Corp.*, 644 F.3d at 1329–46); *see also Wood v. Bailey-Harris Constr. Co.*, No. 2:11-CV-136-WHA, 2012 WL 3069949, at *5 (M.D. Ala. July 27, 2012) (holding that to the extent that [*Lockheed-Martin Corp.*] stands "for an alternative means of defeating summary judgment in a Title VII case, it is easily distinguishable from the present case in light of the weight and volume of the evidence before the [*Lockheed-Martin*] court and dearth of evidence before this court.").

Simply put, Dixon has not offered enough additional evidence to create enough circumstantial proof that DTA's treatment of her was discriminatory based on her race. That is, Dixon has not demonstrated, based on the "totality" of what is before the Court in the record, a convincing mosaic of evidence to convince a jury that DTA intentionally fired her because of her race or otherwise treated her

38

differently. *Lockheed-Martin Corp.*, 644 F.3d at 1346. Therefore, summary judgment is due to be granted to DTA on this claim.

## B. Title VII Retaliation Claim

While Dixon's Amended Complaint is not a model of clarity, it does plausibly allege facts, which accepted as true, state a plausible claim to relief pursuant to Title VII's prohibition against retaliation, and the record does include some evidence to bolster that allegation. Frankly, the Amended Complaint in this case is a mess, but so is DTA's summary judgment motion. Nevertheless, the Court will press on and dutifully examine Dixon's retaliation claim out of an abundance of caution.

Like claims of race discrimination, Title VII retaliation claims based on circumstantial evidence are governed by the *McDonnell Douglas* framework. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). A plaintiff can establish a prima facie case of retaliation by showing that "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970. Once the plaintiff meets this burden, the employer has an opportunity to articulate a legitimate non-retaliatory reason for its employment action, which the plaintiff can rebut with evidence of pretext. *Brown*, 597 F.3d at 1181–82.

39

DTA does not dispute that Dixon engaged in activity protected under Title VII by filing an EEOC complaint. DTA instead argues that Dixon failed to file an additional complaint following her separation, to establish that she suffered any adverse employment action, and to articulate any causal connection between any adverse employment action and her engaging in protected activity.

### 1. Dixon's Failure to File a New EEOC Complaint After Her Reassignment and Termination

First, DTA contends that Dixon failed to administratively exhaust her Title VII claim of retaliation because she did not file a new EEOC complaint (or amend her first charge) following her reassignment and separation (or alleged termination). (Doc. 46 at 11.)

In disputing this contention, Dixon relies on the former Fifth Circuit's holding that a plaintiff need not administratively exhaust a retaliation claim where the employer allegedly retaliated against the plaintiff for filing an EEOC charge. *Gupta v. E. Tex. St. Univ.*, 654 F.2d 411, 414 (5th Cir. 1981).[5]

In light of Dixon's reliance upon it, this opinion's reasoning merits careful summation. As the *Gupta* court stated, requiring a plaintiff in this type of situation to file a new charge "would serve no purpose except to create additional procedural

---

[5] As is customary, the Court notes that under *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

technicalities when a single filing would comply with the intent of Title VII." *Id*.

Any such requirement, the *Gupta* decision additionally explained, would essentially involve "a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII." *Id*. The Eleventh Circuit has reiterated this policy-based rationale and its reluctance to use procedural technicalities to bar Title VII claims. *See Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004); *Baker v. Buckeye Cellulose Corp*. 856 F.2d 167, 168 (11th Cir. 1988).

*Gupta* fits Dixon's circumstances to a tee. As in *Gupta*, Dixon filed an EEOC charge alleging discrimination by her employer. She now alleges that, based on her filing of that administrative charge, DTA retaliated against her. She did not submit another charge specifically complaining about the retaliation, but she did not need to do so because, under this Circuit's precedents, DTA's alleged retaliation "grew out of" the EEOC charge that she did file. Accordingly, the Court concludes that DTA's exhaustion argument lacks merit.

## 2.  Adverse Employment Actions

While her race discrimination and retaliation claims feature considerable factual overlap, the Court's analysis differs for each because the standard for what constitutes adverse employment action in the retaliation context differs from the standard in the Title VII discrimination context.

41

To establish an adverse employment action in the retaliation context, a plaintiff must show that the employer's action would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted).  Whether an employment action qualifies as adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71.

The Eleventh Circuit has recognized that the *Burlington N. & Santa Fe Ry. Co.* decision "strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to [her] and thus constitute adverse employment actions." *Crawford*, 529 F.3d at 973–74, n.13 (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71).  "In deciding whether employment actions are adverse, [the court] consider[s] the employer's acts both individually and collectively." *Akins v. Fulton Cty., Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005).

Nevertheless, the Court reaches the same conclusion as to Dixon's other claimed instances of adverse employment actions.  In this Circuit at least, "glaring, slamming a door in an employee's face, inquiring into retirement plans, commenting that an employee is not a team player, blaming an employee for failed union negotiations, or harboring concerns over an employee's dependability and

trustworthiness are not actions that would dissuade a reasonable worker from making or supporting a charge of discrimination." *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 778 (11th Cir. 2014). This kind of conduct resembles that which Dixon imputed to Williams through her allegations of Williams' harassment.

Equally questionable, it is somewhat difficult to glean from the record before the Court whether Dixon's complaints about Williams are anything more than generalized, and thus unactionable, workplace grievances. The Supreme Court has described actionable adverse actions as those that are *material* because, as the Court said, "it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace." 548 U.S. at 68. Consistent with this logic, an action like, for example, "(w)ithholding a position that an employee would otherwise receive under company policy, particularly when it results in her no longer having a job, might well dissuade a reasonable worker from making or supporting a charge of discrimination." *Gate Gourmet, Inc.*, 683 F.3d at 1259.

Here, Dixon presents no evidence that Williams threatened Dixon's employment with DTA. At most, Williams threatened to take Dixon to the DTA corporate office for not satisfactorily performing her duties. The Court has already discussed why it will not consider Dixon's hearsay allegations regarding Williams' comments about making the Huntingdon post "white again." Therefore, Dixon's

grievances regarding Williams' harassment, even taken collectively, would not be sufficient to dissuade a reasonable employee from engaging in protected activity.

Insofar as Dixon claimed that she was effectively terminated from her job in retaliation for her discrimination complaints, as the Court noted in its substantive discrimination analysis, job termination is a cognizable adverse employment action. *E.g., Crawford*, 529 F.3d at 970-973.

### 3. Causation

Dixon's allegations of retaliation for engaging in protected activity, which took the ultimate form of her effective termination, can be divided roughly into two timeframes: 1) retaliation for complaining to corporate about Williams' harassment after acting as a witness for Tait, and 2) retaliation for filing an EEOC complaint.

Even assuming Dixon's reassignment and subsequent effective termination are adverse employment actions, she must then show her protected speech or conduct motivated DTA to retaliate against her. To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse act were at least somewhat related and in close temporal proximity. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). A "close temporal proximity" between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Id.*

The question is then whether Dixon's reassignment was close enough in time to her complaints to corporate and/or her EEOC complaint to demonstrate the requisite temporal proximity.

As it concerns Dixon's reassignment and alleged termination, a rough timeline can be determined. According to Dixon, she was reassigned sometime in late May or early June 2015. *See supra* Part II. Dixon claims she was effectively terminated on May 28, 2015. *Id.* It is not clear when exactly Dixon complained to DTA's corporate office about Williams' racial harassment (a fact that DTA disputes entirely). In Dixon's EEOC complaint, she identified March 2015 as the month in which Tait complained about Williams' racial harassment and Dixon acted as a witness for her. (Doc. 50-1.) Without question, she filed her EEOC complaint on April 13, 2015. (Doc. 47-4.)

DTA spills quite a bit of ink on the question of whether Dixon properly complied with the company handbook's instructions covering how employees should make complaints to the corporate office. In so doing, it overlooks an essential point: Title VII does not require a plaintiff to make a formal complaint to engage in protected activity. Rather, "Title VII's protections are not limited to individuals who file formal complaints, but extend to those who voice informal complaints as well. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citing *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989)). "The

45

opposition must be made known to the employer in the form of a complaint or some overt rejection of what the employee believes to be an illegally discriminatory practice or decision." *Chandler v. Infinity Ins. Grp.,* Case No. 2:12–cv–2870–TMP, 2014 WL 2547826, at *12, 2014 U.S. Dist. LEXIS 77378 (N.D. Ala. June 4, 2014); *see also Locascio v. BBDO Atlanta, Inc.,* 56 F. Supp. 3d 1356, 1364 (N.D. Ga. 2014); *Reynolds v. Golden Corral Corp.,* 106 F. Supp. 2d 1243, 1253–54 (M.D. Ala. 1999). Based on such precedent, Dixon's conversation with corporate at the meeting regarding Tait (assuming it took place) would qualify as protected activity.

Granted, Dixon did not allege that anyone in DTA's corporate office displayed any racial animus or discriminatory attitude towards her. Further, Dixon admitted that Williams did not have the power to direct her reassignment. All the same, under a "cat's paw" theory, a non-decisionmaker's discriminatory animus may be imputed to a neutral one when the latter has not independently investigated allegations of misconduct. *See Llampallas v. Mini–Circuits, Lab, Inc.,* 163 F.3d 1236, 1249 (11th Cir. 1998) (citing *Long v. Eastfield Coll.,* 88 F.3d 300, 307 (5th Cir. 1996) ("If ... [the decisionmaker] did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of [those who held a discriminatory animus], the causal link between [the plaintiffs'] protected activities and their subsequent termination, would remain intact.")). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give

46

effect to the recommender's discriminatory animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).  DTA disputes that Dixon ever complained to DTA about Williams' harassment in the first place. (Doc 46 at 6.)

The Eleventh Circuit has held that "close temporal proximity" between the protected conduct and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case. *See Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).  "Close temporal proximity" may be sufficient to show a protected activity and an adverse employment action were not "wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). However, temporal proximity, without more, must be "very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  So, for example, when three or more months elapse between a protected activity and an adverse employment action, the temporal proximity of the events is not "very close." *Id.*

Dixon's meeting with corporate took place sometime around March 2015. DTA was issued a Notice of Charge of Discrimination following Dixon's EEOC complaint on April 14, 2015.  (Doc. 47-4 at 1.)  Dixon was reassigned to the post that she could not physically perform in late May 2015.  Given the evidence before the Court, the temporal proximately between Dixon's EEOC complaint in April 2015 and her reassignment and effective termination somewhere around late May

47

2015 or early June 2015, stands right at the edge of where the Eleventh Circuit has drawn the line for purposes of requisite temporal proximity to infer causation. *See Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 230 (11th Cir. 2011) ("Even if we considered this time frame, the two-month gap may be 'closer' in time, but it is not 'very close.'); *Robinson v. LaFarge N. Am., Inc.,* 240 F. App'x. 824, 829 (11th Cir. 2007)(causation sufficiently alleged where adverse action occurred about two months after protected activity); *see also Stone v. Geico Gen. Ins. Co.,* 279 F. App'x 821, 824 (11th Cir. 2008); *Higdon,* 393 F.3d at 1220 (one-month period not too protracted to fail causation); *Locascio*, 56 F. Supp. 3d at 1370–71 (sufficient proximity where plaintiff complained about discriminatory conduct in mid-July, was reassigned to "new business" sometime in August, and was terminated from employment in September, all in the same year); *compare Herron-Williams*, 2020 WL 599301, at *9 (where plaintiff employee filed EEOC charge in March, employer responded to EEOC in July, and employee's pay was reduced in September of the same year, not enough temporal proximity to establish causal connection for retaliation claim); *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 915 (11th Cir. 2009)(per curium)(three-and-a-half months too remote to infer causation)).

"(W)hen causation is based solely on temporal proximity, the two events must be 'very close' to establish the requisite causal connection." *Montgomery v. Bd. of Trs. of Univ. of Ala.*, Case No. 2:12-CV-2148-WMA, 2015 WL 1893471, at *1 (N.D.

Ala. Apr. 27, 2015) (opinion of Acker, J.) (citing *Edwards v. Nat'l Vision, Inc.*, 946 F. Supp. 2d 1153, 1175 (N.D. Ala. 2013) (quoting *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007))). "Indeed, as the Eleventh Circuit opined in another context…(t)he *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. It literally means 'after this, because of this.' It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship." *Montgomery*, 2015 WL 1893471, at *4 (citing *McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1243 (11th Cir.2005)(citing in turn Black's Law Dictionary 1186 (7th ed.1999)); *see Abbott v. Fed. Forge, Inc.,* 912 F.2d 867, 875 (6th Cir.1990) ("[P]ost hoc, ergo propter hoc is not a rule of legal causation[.]").

On the other hand, the Eleventh Circuit has stated that the causal link requirement under Title VII must be construed broadly, for "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Olmsted v. Taco Bell Corp*., 141 F.3d 1457, 1460 (11th Cir. 1998) (citing *E.E.O.C. v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1571–72 (11th Cir. 1993)).

In the end, regardless of whether a month and a half between Dixon's EEOC complaint and her reassignment or two months in between her meeting with corporate and the reassignment is too hot, too cold, or just right, in order to survive

summary judgment "there must be a genuine dispute as to whether the protected activity was a but-for cause of the adverse employment action." *Herron-Williams*, 2020 WL 599301, at *9 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."). In other words, to survive summary judgment here, there must be a genuine dispute that, *but for* Dixon's filing of a charge of discrimination with the EEOC, DTA would not have reassigned her.

Dixon has relied mostly on a theory of temporal proximity to show causation. Thus, she maintains that it was not until after she filed her EEOC charge in April 2015 that she was reassigned to the Southeastern Stud post in late May of 2015. Dixon also submits that the "increased scrutiny" she incurred after complaining about Williams can provide evidence of DTA's intent to retaliate against her. *See Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524–25 (11th Cir. 1991), *superseded by statute on other grounds*, *as recognized in Munoz v. Oceanside Resorts, Inc*., 223 F.3d 1340, 1347 (11th Cir. 2000).

Dixon's evidence of increased scrutiny falls short of that which took place in *Weaver.* At best, Dixon vaguely alleges that the harassment intensified and that Williams would follow her around while on the job. Presumably, according to Dixon's EEOC complaint, the increased scrutiny followed the meeting with

50

corporate regarding Tait in March 2015, though Dixon has difficulty identifying dates associated with the conduct she complains about, let alone the intensified scrutiny, in her deposition.  (*See* Doc. 47-2.)

The Court cannot say that the evidence presented by Dixon demonstrates a "genuine dispute" whether DTA reassigned Dixon from the Huntington post *because of and in retaliation for Dixon's* EEOC complaint.  "Merely showing that she was terminated shortly after she complained does not meet the prima facie standard for proof that she was terminated only because she complained."  *Montgomery*, 2015 WL 1893471, at *4 (citing *Nassar*, 570 U.S. at 362).

Therefore, because she failed to establish a prima facie case for retaliation under *Nassar*, summary judgment is appropriate on Dixon's retaliation claim.

## C. Title VII Hostile Work Environment

While Dixon vaguely alludes to a hostile work environment that was created by Williams' harassment, she never actually pled that claim in the Amended Complaint, the controlling pleading.[6]  (Doc. 8.)  Nevertheless, proceeding as if Dixon had in fact done so, she must show (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee ...; (4) that the

---

[6] Such claims should generally be dismissed out of hand.  *E.g.*, *Nurse v. City of Alpharetta*, 775 F. App'x 603, 607 (11th Cir. 2019); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010).

harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). As it must, this Court considers the following factors in evaluating whether conduct is severe or pervasive enough to create an objectively hostile or abusive work environment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. In so doing, it must employ common sense and "an appropriate sensitivity to social context" when determining whether a plaintiff has alleged facts that a jury could reasonably find created an objectively hostile or abusive work environment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998). A plaintiff can show that alleged conduct was based on a protected characteristic, such as race, by showing that "similarly situated persons [who were not in the protected class] were

treated differently and better." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir. 2007).

As summarized above, *see supra* Part I, Dixon claims Williams, her supervisor, subjected her to racial remarks and negative treatment from January 2015 to May 2015. Her precise allegations are as follows:

- Another employee told Dixon that Williams wanted to make the Huntington post "all white again";

- Williams said she would "hang" and "drag" Dixon to the corporate office;

- Williams threw Dixon's paperwork across the car;

- Williams subjected Dixon to unwarranted scrutiny;

- Williams made her gas up the DTA car; and,

- Williams made her pick up newspapers, boxes and the mail.

Dixon also points to her removal from the Huntingdon post and, ultimately, DTA's refusal to give her any new assignments as a part of her hostile work environment claim's tableau.

Even at first blush, this account raises concern. Indeed, the Eleventh Circuit has already found that where the plaintiff "could only recall eight specific instances [of racist comments] over the course of two years . . . there was not sufficient evidence presented for a reasonable person to conclude that the harassment was frequent." *Alexander v. Opelika City Sch.*, 352 F. App'x 390, 393 (11th Cir. 2009).

On the other hand, the Eleventh Circuit has at least partially relied on similarly vague testimony to affirm a trial court's finding of a racially hostile work environment. *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1070 n. 6 (11th Cir. 1990) ("There was testimony that [racially offensive] comments and incidents occurred 'daily.'").

Regardless, the other factors used to determine whether conduct is objectively severe or pervasive weigh against Dixon.

"Conduct is objectively severe when the workplace is permeated with intimidation, ridicule, and insult." *Hollingsworth v. O'Reilly Auto. Stores, Inc.*, Case No. 4:13-CV-1623, 2015 WL 412894, at *13, 2015 U.S. Dist. LEXIS 10956 (N.D. Ala. Jan. 30, 2015) (citing *Miller*, 277 F.3d at 1276–77). "Simple teasing, offhanded comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (citing *Oncale*, 523 U.S. at 81).

The conduct alleged by Dixon here, even if proved to a reasonable jury's satisfaction, simply does not rise to beyond this level and therefore cannot support an actionable Title VII hostile work environment claim. Dixon alleges that she was harassed by her white supervisor on a constant and frequent basis. (*See generally* Doc. 47-2.) Dixon further claims that, as a result of the racialized harassment, she reported the harassment to the corporate office and yet the harassment continued, ultimately resulting in her transfer and separation. While Williams' statements,

some of which are hearsay, are certainly offensive and inappropriate, they do not meet the standard to trigger liability for a Title VII hostile work environment claim.

Three appellate cases underscore why this conclusion follows. In 2005, the Eleventh Circuit affirmed summary judgment against a racially hostile environment claim when the allegedly harassing conduct was much worse than what Dixon claims in the instant case. *See, e.g, Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57 (11th Cir. 2005). In *Barrow*, African American plaintiffs stated that they saw confederate flag stickers, the letters "KKK," and a noose at work on several different occasions. *Id.* One plaintiff even said that his superintendent called him a particularly egregious racial epithet three times and called him "boy" repeatedly. *Id.*

Three years later, in *McCann v. Tillman*, the Eleventh Circuit found that a black employee's allegations that a white supervisor called her "girl" and two male black employees "boys" on one occasion, and that another coworker referred to a former black employee as a "n--- bitch," did not amount to severe or pervasive harassment. 526 F.3d 1370, 1378–79 (11th Cir. 2008). "Although offensive, such instances of racially derogatory language alone, extending over a period of more than two years, [were] too sporadic and isolated to establish that her employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment." *Id*. at 1379.

55

Conversely, in *Miller* the Eleventh Circuit did find that the plaintiff had established sufficient evidence that the alleged harassment was frequent because, "[plaintiff] *and others* testified that [supervisor's] name-calling permeated the Dothan facility—he hurled the ethnic slurs at Miller three to four times a day. Miller's duties required him to go into the service area and interact with [the supervisor] on a daily basis, which means he was unavoidably exposed to the harassing comments throughout the approximately one month period the two men were both employed at Kenworth."   277 F.3d at 1276 (emphasis added). Revealingly, Dixon has not produced any other testimony besides her own[7] regarding Williams' harassing statements.

If the conduct alleged in *Barrow* and *McCann* fell short of being severe enough to create a racially hostile work environment, so too must the conduct Dixon has alleged here. As this Court explained in its direct evidence analysis regarding Dixon's Title VII discrimination claim, the language used by Williams in her interactions with Dixon, including the "hang and drag" comment, comes nowhere close to the clearly racist statements that courts have examined in the hostile work environment context which did not survive summary judgment either. *See Barrow*,

---

[7] As to the hearsay statements, Dixon has not presented any testimony from those individuals who allegedly heard Williams make racially inappropriate statements.

*supra*; *McCann*, *supra*; *see also Mills v. Cellco P'ship*, 376 F. Supp. 3d 1228, 1241-1244 (N.D. Ala. 2019).

The Court concludes that a jury could not reasonably find that Williams' statements were sufficiently severe and pervasive to support a hostile work environment claim under Title VII. Summary judgment on that claim, as far it was properly pled in the first place, is therefore appropriate.

## V. CONCLUSION

For the reasons discussed above, DTA's Motion for Summary Judgment (Doc. 46) is GRANTED as to all claims in the Amended Complaint and this case is dismissed with prejudice.

DONE, this 8th day of May, 2020.


_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE